1-00-2890

SECOND DIVISION

September 25, 2001

No. 1-00-2890

ELMA JACKSON,            
 ) Appeal from the

     ) Circuit Court of 

Petitioner-Appellee, ) Cook County.   

)

v. ) Case No. 91 D 65188

) 

ANTHONY NEWSOME,            ) The Honorable 

   ) Drella Savage, 

          Respondent-Appellant. ) Judge Presiding.

JUSTICE GORDON delivered the opinion of the court:

Appellant Anthony Newsome appeals from the Cook County circuit court's granting of a motion to strike and dismiss his verified complaint to establish non-paternity.  In this complaint, which was filed in February 2000, Newsome sought a determination that he was not the biological father of appellee Elma Jackson's daughter, Alecia Ashley Jackson.  Newsome, who was never married to the mother, Elma Jackson (Elma), had previously been identified as the natural father in a December 1991 complaint filed by Elma to determine the existence of the father-and-child relationship.  About a month later (January 22, 1992) Elma and Newsome signed an order of parentage and support under which Newsome, who was named the natural father, was to make support payments.  However, DNA testing conducted in December 1998 indicated that Newsome was not the father, and he subsequently filed his complaint to establish non-paternity.  Elma moved to strike and dismiss the complaint, and the trial court granted the motion, finding that Newsome was not a presumed father within the scope of section 5 of the Illinois Parentage Act of 1984 (the Parentage Act) (750 ILCS 45/1 
et seq.
 (West 2000)), and he therefore lacked standing to file his complaint.

According to Elma's complaint to determine the existence of the father and child relationship, which was filed on December 6, 1991, she and Newsome engaged in sexual intercourse during the period from March 1989 to September 1990.  Elma alleged that she became pregnant as a direct result, and gave birth to Alecia Jackson on December 17, 1989.  The trial court subsequently found that Newsome was the natural father of the child.  In an order of parentage and support dated January 22, 1992, Newsome was ordered to pay support of $175 per month "by agreement of the parties."  Newsome and Elma both signed the order to indicate their agreement.  

On May 15, 1997, Newsome filed a 
pro se
 motion for blood testing, alleging that Elma had told him that he was not the child's father.  On December 4, 1997, Newsome apparently filed a petition to vacate the trial court's January 22, 1992, order establishing the child's parentage.  The petition itself does not appear in the record, but a notice of petition filed on December 4, 1997, which 
is
 included in the record, gives notice that the petition would be filed pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2000)). 

In April 1998, the trial court denied Newsome's section 2-1401 petition.  The court noted that it had been more than six years since the January 1992 order was entered.  According to the court, Newsome's petition thus was time-barred.
(footnote: 1)  In denying Newsome's petition, the trial court indicated that Newsome had alleged that Elma had fraudulently concealed his lack of parentage of the child, and he had alleged that the two-year limitation period under section 2-1401 therefore did not apply.  However, the court found that Newsome's allegation of fraudulent concealment had not been proven, and that the two-year limitations period did apply.  Thus the court found that there were no "legally sufficient grounds for setting aside the [January 1992] judgment."  The court also denied Newsome's motion for a blood test.  

On February 1, 2000, Newsome filed his verified complaint to establish non-paternity pursuant to subsection 7(b-5) of the Parentage Act (750 ILCS 45/7(b-5) (West 2000)).
(footnote: 2)  Subsection 7(b-5) amends the Parentage Act to permit a man who has been previously adjudicated to be the father of a child to challenge the adjudication if deoxyribonucleic acid (DNA) tests determine that he is not the natural father.  

Newsome alleges in his subsection 7(b-5) complaint that he agreed to the entry of the January 1992 order establishing his parentage "based on the representations of the petitioner, Elma Jackson, that he was the biological father of her child, Alechia Ashley Jackson."  On December 29, 1998, tissue was taken from Newsome and from "his purported child, Alechia Ashley Jackson, for the purpose of DNA testing to determine if he [was] the biological father."  A "DNA Paternity Report" attached to the subsection 7(b-5) complaint states that:

"The alleged father, ANTHONY NEWSOM, 
is excluded
 as being the father of the child, ALECHIA ASHLEY JACKSON." (Emphasis in original.)

For three different genetic systems analyzed with the polymerase chain reaction, the alleged father, ANTHONY NEWSOM[,] failed to match the obligate paternal allele present in the child, ALECHIA ASHLEY JACKSON."  

Thus according to the DNA report, Newsome could not have been the child's natural father.  

Elma moved to strike and dismiss Newsome's complaint pursuant to sections 615 and 619 of the Code of Civil Procedure (735 ILCS 5/2-615 & 5/2-619 (West 2000)).  Elma alleged that she and Newsome were never married to each other, and they "never signed a voluntary acknowledgement of parentage pursuant to the Illinois Department of Public Aid Code or Section 12 of the Vital Records Act."  Elma alleged that Newsome was not a presumed father pursuant to section 5 of the Parentage Act (750 ILCS 45/5 (West 2000)), and he therefore lacked standing to file his verified complaint.  

Following a hearing, the trial court granted Elma's motion to strike and dismiss the complaint.  In an order entered on July 17, 2000, the court found that Newsome "is not a presumed father as outlined in Section 5 of the Illinois Parentage Act of 1984 and lacks standing to file a 45/7(b-5) Verified Counter-Complaint [sic] to Establish Non-Paternity."  The court stated that "[t]he order of parentage and support entered on 1/22/92 shall remain in full force and effect."  

Newsome filed his notice of appeal on August 14, 2000, seeking reversal of the trial court's July 17, 2000, order dismissing his subsection 7(b-5) complaint.

DISCUSSION

Newsome urges on appeal that the January 22, 1992, order establishing Alecia Jackson's parentage constituted an acknowledgement of parentage within the meaning of section 5(a)(4) of the Parentage Act, and that Newsome thus is a presumed father within the meaning of section 5.  Accordingly, Newsome asserts that he had standing to seek a determination of non-paternity pursuant to subsection 7(b-5) of the Parentage Act.  We agree.

Subsection 7(b-5), which was added to the Parentage Act in August 1998, "provides a new cause of action allowing an adjudicated father to challenge the adjudication 'if' DNA tests establish nonpaternity."   
In re Marriage of Lubbs
, 313 Ill. App. 3d 968, 970, 730 N.E.2d 1139, 1142 (2000).  Prior to this amendment, a man adjudicated to be the father of a child could not reopen the case once a paternity judgment became final, "even where subsequent DNA evidence conclusively establishe[d] nonpaternity."  
Marriage of Lubbs
, 313 Ill. App. 3d at 970, 730 N.E.2d at 1142.   

Subsection 7(b-5) of the Parentage Act provides that:

"An action to declare the non-existence of the parent and child relationship may be brought subsequent to an adjudication of paternity in any judgment by the man adjudicated to be the father 
pursuant to the presumptions in Section 5 of this Act
 if, as a result of deoxyribonucleic acid (DNA) tests, it is discovered that the man adjudicated to be the father is not the natural father of the child.  Actions brought by the adjudicated father shall be brought by verified complaint.  If, as a result of the deoxyribonucleic acid (DNA) tests, the plaintiff is determined not to be the father of the child, the adjudication of paternity and any orders regarding custody, visitation, and future payments of support may be vacated."  (Emphasis added.)  750 ILCS 45/7(b-5) (West 2000).  

Thus under subsection 7(b-5), where DNA evidence establishes nonpaternity, a man adjudicated to be the father of a child may challenge this prior judgment if he was adjudicated to be the father "pursuant to the presumptions of Section 5" of the Parentage Act.  

Section 5 of the Parentage Act states in pertinent part that: 

"(a) A man is presumed to be the natural father of a child if: 

(1) he and the child's natural mother are or have been married to each other, even though the marriage is or could be declared invalid, and the child is born or conceived during such marriage;

(2) after the child's birth, he and the child's natural mother have married each other, even though the marriage is or could be declared invalid, and he is named, with his written consent, as the child's father on the child's birth certificate;

(3) he and the child's natural mother have signed an acknowledgement of paternity in accordance with rules adopted by the Illinois Department of Public Aid under Section 10-17.7 of the Illinois Public Aid Code; or 

(4) he and the child's natural mother have signed an acknowledgement of parentage or, if the natural father is someone other than one presumed to be the father under this Section, an acknowledgement of parentage and denial of paternity in accordance with 
Section 12 of the Vital Records Act
."  (Emphasis added.)  750 ILCS 45/5(a) (West 2000). 

Since Newsome and Elma Jackson were never married, and since there was no involvement of the Illinois Department of Public Aid, there is no dispute that subsections (a)(1), (a)(2) and (a)(3) of Section 5 have no application here.  Thus the pertinent provisions which must be addressed under the facts of this case are those contained in subsection (a)(4), which in turn refers to section 12 of the Vital Records Act (Records Act) (410 ILCS 535/12 (West 2000)).  It is subsection 5(a)(4) upon which Newsome seeks to premise his 7(b-5) action.    

Elma notes that Section 12 of the Records Act "provides the procedure for acknowledging a child out of wedlock," even specifying "the forms to be used."  Elma appears to argue that since section 5(a)(4) of the Parentage Act refers to section 12 of the Records Act, the acknowledgement of parentage mentioned in section 5(a)(4) must be an acknowledgement that is made in accordance with section 12 of the Records Act. There is no dispute among the parties that, of the provisions of section 12, the portion that applies here is subsection (4).  

 Subsection 12(4) states that: 

"Unless otherwise provided in this Act, if the mother was not married to the father of the child at either the time of conception or the time of birth, the name of the father shall be entered on the child's birth certificate only if the mother and the person to be named as the father have signed an acknowledgement of parentage in accordance with subsection (5).  

Unless otherwise provided in this Act, if the mother was married at the time of conception or birth, and the presumed father (that is, the mother's husband) is not the biological father of the child, the name of the biological father shall be entered on the child's birth certificate only if, in accordance with subsection (5), (i) the mother and the person to be named as the father have signed an acknowledgement of parentage and (ii) the mother and the presumed father have signed a denial of paternity.”  410 ILCS 535/12(4) (West 2000). 

Subsection 12(4) includes by reference subsection (5), which provides for specific formats to be followed in obtaining an acknowledgement of parentage, and also provides for the transmission of these forms to the Illinois Department of Public Aid.  Elma contends that since the January 22, 1992, order containing the acknowledgement of Alecia Jackson's parentage did not conform with subsection 12(5) of the Records Act, it cannot satisfy the requirements of subsection 5(a)(4) of the Parentage Act, and it therefore does not meet the requirements of subsection 7(b-5) of the Parentage Act.  

As previously noted, the prerequisites for a 7(b-5) action include not only that a man is adjudicated to be a father, but also that this adjudication is made "pursuant to the presumptions in Section 5 of this Act."  750 ILCS 45/7(b-5) (West 2000). Under this language, a man adjudicated to be a father based on a 
presumption
 that he is the father (
e.g.
, because he and the mother signed an acknowledgement of parentage) may challenge the adjudication, where DNA tests show that he is not the natural father.  No rationale is offered to explain why the statute would seek to distinguish between presumptions that are based on the acknowledgement of parentage denoted in subsection 12(5) of the Records Act, and an acknowledgement as in this instance which omits the minute technical formats and procedures outlined in  subsection 12(5).  Thus any such distinction read into the statute would appear to be wholly arbitrary.  It would be far more cogent to construe the relevant provision in subsection 7(b-5) which refers to the presumptions in section 5 of the Parentage Act as drawing a distinction between adjudications based on 
presumptions
 of paternity, which may be challenged with DNA evidence,
(footnote: 3) and other adjudications such as those based on a blood test, where such a challenge would be inappropriate.  Under this approach, subsection 7(b-5) would be applicable to an adjudication of parentage resulting from circumstantial inferences raising a presumption, but would not be applicable to a judicial determination predicated on scientific evidence.  
Cf.
 
Marriage of Lubbs
, 313 Ill. App. 3d at 971, 730 N.E.2d at 1142 (concluding that subsection 7(b-5) creates a 
limited
 exception to the rule that an adjudicated father is barred from challenging the adjudication).

Under this analysis, we would conclude that subsection 7(b-5)'s reference to the presumptions in section 5 of the Parentage Act is not meant to incorporate the minute and ministerial technical requirements of section 12 of the Records Act, which are twice removed from the original 7(b-5) reference and which are not relevant to its purpose in differentiating between adjudications based on presumptions and those based on more solid scientific evidence such as a blood test.  This view is supported by a well-settled rule of statutory construction.  Subsection 7(b-5) of the Parentage Act is a statute of “specific reference” because 
it refers specifically to a particular statute by its title or section number, in 
this instance section 5 of the Parentage Act.  See 2B N. Singer, Sutherland's Statutes and Statutory Construction §51.07, at 269 (6
th
 ed. 2000).  Statutes of specific reference incorporate only those parts of the statute referred to that are appropriate or applicable.  See 
Zurich General Accident & Liability Insurance Co. v. Industrial Comm'n
, 331 Ill. 576, 580, 163 N.E. 466, 468 (1928); accord 
State ex rel. Ostrowski v. Haguewood
, 782 P.2d 213, 215 (Wash. Ct. App. 1989) ("'In a statute of specific reference only the appropriate parts of the statute referred to are considered'"); 
Legat v. Adorno
, 83 A.2d 185, 194 (Conn. 1951) ("[W]here *** the adopting statute is one of specific reference, only the appropriate parts of the statute referred to are taken"); 2B N. Singer, Sutherland's Statutes and Statutory Construction §51.08, at 273-74 (6
th
 ed. 2000). 

The foregoing conclusion that the 7(b-5) reference to section 5 of the Parentage Act does not incorporate the technical requirements of subsection 12(5) of the Records Act is fortified by the fact that neither section 12 nor subsection 12(5) of the Records Act is explicitly referred to in subsection 7(b-5).  See 
State ex rel. Ostrowski v. Haguewood
, 782 P.2d 213 (Wash. Ct. App. 1989).  In 
Ostrowski
, the statute at issue dealt with city council vacancies in a city that operated under a council-manager plan of government.  This statute referred to another statute to govern the filling of these vacancies, and this second statute was the same one that governed the filling of vacancies under a mayor-council plan of government, which in turn was regulated by a third statute.  This third statute, which was not referred to in the first statute, limited the voting rights of a mayor under the mayor-council plan.  The question on appeal was whether the first statute, in referring to a second statute governing the filling of council vacancies under a mayor-council plan, incorporated the voting restrictions in the third statute, which also applied to a mayor-council plan.  The court in 
Ostrowski
 held that it did not, noting that the first statute referred to the second statute but "it does not additionally refer to [the third statute] to limit the mayor's voting rights in the vacancy filling process."  
Ostrowski
, 782 P.2d at 215.  

Similarly in the instant case, subsection 7(b-5) refers to "the presumptions in Section 5" of the Parentage Act, but it makes no mention of section 12 of the Records Act.  Further, while section 5 of the Parentage Act does refer to section 12 of the Records Act, it does not specifically refer to subsection 12(5), which is not mentioned until we come to section 12 itself.

For the reasons set forth above, we conclude that the sub-requirements of section 12 of the Records Act are not incorporated into subsection 7(b-5) of the Parentage Act.   Therefore, the acknowledgement of parentage which was signed by Elma and Newsome was in accordance with subsection 7(b-5), and Newsome thus had standing to bring his 7(b-5) action.  

Elma next argues that even if full compliance with section 12 of the Records Act were not required, Newsome is nevertheless precluded from bringing his 7(b-5) complaint under the provisions of subsection 7(d) of the Parentage Act. 
 Subsection 7(d) provides that:  

"Regardless of its terms, an agreement, 
other than a settlement approved by the court
, between an alleged or presumed father and the mother or child, does not bar an action under this Section."  (Emphasis added.)  750 ILCS 45/7(d) (West 2000).  

Elma appears to argue that since a "settlement approved by the court" 
would
 bar an action under section 7 of the Parentage Act, then only agreements reached through administrative (and not judicial) means would satisfy the requirements of the statute.  Elma appears to equate the January 22, 1992, order with a "settlement approved by the court," and thus contends that since the 1992 order was part of a judicial proceeding, Newsome is precluded from pursuing a 7(b-5) remedy.  This argument is unpersuasive. 

The phrase "settlement approved by the court" as used in section 7(d) of the Parentage Act "is properly construed as referring to the settlement orders of section 12.1 of the Parentage Act."  
Illinois Department of Public Aid ex rel. McGee v. Kennedy
, 211 Ill. App. 3d 158, 162, 570 N.E.2d 12, 15 (1991).  

Section 12.1 of the Parentage Act provides that: 

"In cases 
where the alleged father has not consented to a finding of paternity and where the parties have requested a settlement
, the court shall review the proposed settlement in light of the allegations made, the probable evidence and the circumstances of the parties.  If the court is satisfied that the best interests of the child and of the parties will be served by entry of an order incorporating the settlement, and if the court is satisfied that the financial security of the child is adequately provided for and that the child and its mother are not likely to become public charges, it may enter an order so incorporating the settlement.  The order may be directed to the defendant, or the mother, or both.  Notwithstanding subsection (d) of Section 7 of this Act, neither the entry of a settlement order, nor the terms of a settlement order shall bar an action brought under this Act by a child to ascertain paternity."  (Emphasis added.)  750 ILCS 45/12.1 (West 2000).  

Thus section 12.1 deals with situations "where the alleged father has not consented to a finding of paternity and where the parties have requested a settlement."  This is not the situation here, where, as noted, Newsome acknowledged paternity in the agreed order of January 22, 1992, which he and Elma signed to indicate their agreement.  Such an agreement 
acknowledging parentage
 could not be the same as the "settlement approved by the court" denoted in subsection 7(d), which refers to the scenario outlined in section 12.1 where such acknowledgement of parentage is lacking.   

We conclude that while the January 22, 1992, order establishing Alicia Jackson's parentage came in a judicial proceeding, this order was not the equivalent of a “settlement approved by the court” denoted in subsection 7(d) of the Parentage Act.  Accordingly, contrary to Elma’s contentions, the January 1992 order did not fall within the scope of subsection 7(d), and Newsome had standing to bring his 7(b-5) action. 

Elma next contends that the issue of whether Newsome is the child's father has already been adjudged in her favor, and that under the doctrines of 
res judicata
 and collateral estoppel, Newsome is barred from re-litigating the matter.  She points to Newsome's section 2-1401 petition to vacate the January 22, 1992, order establishing Alicia Jackson's parentage, noting that this petition was denied by the trial court.  In addition, Newsome's subsequent 7(b-5) complaint to establish non-paternity was dismissed by the trial court.  

This argument ignores the fact that, as noted, the Parentage Act was amended by the addition of subsection 7(b-5), effective August 7, 1998, specifically to allow an adjudicated father to collaterally attack this previous adjudication if subsequent DNA tests established that he was not the father.  See 
Marriage of Lubbs
, 313 Ill. App. 3d at 970, 730 N.E.2d at 1142.  As set forth above, subsection 7(b-5) provides in pertinent part that: 

"An action to declare the non-existence of the parent and child relationship may be brought 
subsequent to an adjudication of paternity in any judgment
 by the man adjudicated to be the father pursuant to the presumptions in Section 5 of this Act if, as a result of deoxyribonucleic acid (DNA) tests, it is discovered that the man adjudicated to be the father is not the natural father of the child."  (Emphasis added.)  750 ILCS 45/7(b-5) (West 2000).

On its face, subsection 7(b-5) provides for a cause of action to set aside a previous adjudication of paternity if subsequent DNA tests establish non-paternity.  

Elma relies upon 
In re Paternity of Rogers
, 297 Ill. App. 3d 750, 697 N.E.2d 1193 (1998), but her reliance is entirely misplaced.  While 
Rogers
 does in fact hold that under the principles of 
res judicata
, DNA findings cannot be used to challenge an adjudication of paternity once it is so found by the court, that decision was arrived at before the subsection 7(b-5) amendment to the Parentage Act became effective.  The decision in 
Rogers
 thus is no longer the law on this issue, as was recognized by the court in 
Marriage of Lubbs
.  There the court stated that: 

"Prior to passage of this amendment [subsection 7(b-5)], a man adjudicated to be the father of a child could not challenge the adjudication even where subsequent DNA evidence conclusively establishes nonpaternity.  See 
In re Paternity of Rogers
, 297 Ill. App. 3d 750, 232 Ill. Dec. 263, 697 N.E.2d 1193 (1998).  Subsection 7(b-5) provides a new cause of action allowing an adjudicated father to challenge the adjudication 'if' DNA tests establish nonpaternity."  
Marriage of Lubbs
, 313 Ill. App. 3d at 970, 730 N.E.2d at 1142.  

Finally, Elma argues that Newsome's 7(b-5) complaint (filed on February 1, 2000) was time-barred because it was filed more than six months after the August 7, 1998, effective date of the subsection 7(b-5) amendment, and "more than two years after May 15, 1997, when the defendant demonstrated knowledge of relevant facts by moving for a blood test."

The limitations periods for actions filed under subsection 7(b-5) are stated in subsection 8(a)(4) of the Parentage Act, which provides in pertinent part that:

"An action to declare the non-existence of the parent and child relationship brought under subsection (b-5) of Section 7 of this Act shall be barred if brought more than 6 months after the effective date of this amendatory Act of 1998 or more than 2 years after the petitioner obtains 
actual knowledge of relevant facts
, whichever is later.  The 2-year period shall not apply to periods of time where the natural mother or the child refuses to submit to deoxyribonucleic acid
 
(DNA) tests."  (Emphasis added.)  750 ILCS 45/8(a)(4) (West 2000). 

Thus it is Elma's contention that the two-year limitation period for subsection 7(b-5) actions begins to run not when the DNA results are known, but rather when the adjudicated father demonstrates his "knowledge of relevant facts" by, 
e.g.
, moving for a blood test.  Elma apparently construes the phrase "knowledge of relevant facts" to mean the adjudicated father's suspicion that he is not the father. 

Newsome argues that the two-year limitations period could not have begun when Newsome moved for a blood test on May 15, 1997.  He emphasizes that a 7(b-5) action may not be filed until after the completion of a DNA test.  Newsome thus appears to argue that the limitations period begins once the DNA test is completed and not before.  If this were the case, his 7(b-5) complaint, which was filed on February 1, 2000, would be timely because it came within two years of the completion of the DNA test.  Newsome also contends that “the two[-]year limitations period was tolled until at least December 29, 1998, the date when blood was drawn from the respondent [Newsome] and petitioner’s [Elma’s] child for the purpose of DNA testing.”   In making this contention, Newsome appears to argue in the alternative that even if the limitations period began earlier, the period was tolled until the test was performed, pursuant to the 8(a)(4) provision tolling the two-year period during the time when the natural mother or the child refuses to submit to a DNA test.  This would also mean that Newsome’s 7(b-5) action was timely filed.  For the reasons discussed below, we conclude that the first of Newsome’s two arguments has no merit, but that he may prevail on the second argument if it is proven.

We agree with Newsome’s initial premise that a DNA test result is a necessary prerequisite to the filing of a 7(b-5) action.  As set forth above, subsection 7(b-5) provides that an action to declare the non-existence of the parent and child relationship may be brought “if, as a result of deoxyribonucleic acid (DNA) tests, it is discovered that the man adjudicated to be the father is not the natural father of the child.” 750 ILCS 45/7(b-5) (West 2000.  The court in 
Marriage of Lubbs
 states the same thing, holding that subsection 7(b-5) provides a cause of action “only if DNA testing has established, 
prior to the filing of the petition
, that the adjudicated father is not the natural father.”  (Emphasis in original.)  
Marriage of Lubbs
, 313 Ill. App. 3d at 970, 730 N.E.2d at 1142; accord 
Donath v. Buckley
, 319 Ill. App. 3d 83, 87 (2001) (“Under the plain language of the statute, no person would have standing to file an action under section 7(b-5) until after the DNA test had been completed”) (citing 
Marriage of Lubbs
).  

However, to say that a 7(b-5) action may not be filed absent a DNA test is not tantamount to a holding that the limitations period itself begins with the completion of this test.  If that were the case, the legislature could have said so in explicit terms, rather than stating that the two-year limitations period began when “the petitioner obtains actual knowledge of relevant facts.”  More overridingly, the tolling provision of subsection 8(a)(4) would then be unnecessary.  If the limitations period commenced with the DNA test and not before, there would be no need for this period to be tolled for “periods of time where the natural mother or the child refuses to submit to deoxyribonucleic acid (DNA) tests.”  We decline to construe the statutes at issue in such a way as to render the tolling provision superfluous.  The presence of "mere surplusage" is not to be presumed in statutory construction.  
County of Winnebago v. Industrial Comm'n
, 34 Ill. 2d 332, 335, 215 N.E.2d 258, 260 (1966).  

Accordingly, we conclude that the “actual knowledge of relevant facts” that triggers the two-year limitations period is not limited to the receipt of DNA test results.  Rather, the two-year limitations period can be triggered by obtaining such knowledge from any reasonably reliable source.  Thus, while a 7(b-5) action itself may not be brought absent DNA test results, the two-year limitations period can begin prior to this time but is tolled where the mother or the child refuses to submit to the test.    

As noted, Newsome appears to argue in the alternative that in any event the two-year period was tolled until at least December 29, 1998, when his DNA test was begun, and that his 7(b-5) action therefore was timely filed.  Since the 8(a)(4) tolling provision applies only where the mother or child refuses to submit to a DNA test, Newsome apparently is contending that this was the case here.  However, there is no indication that these facts were considered by the trial court or that these questions were traversed in Elma’s factual motion to dismiss Newsome’s complaint pursuant to section 2-619.  Further, there is nothing in the record before us to indicate that Elma or Alecia refused to submit to the test, or that any such refusal on their part delayed the completion of the test.  

The sole issue raised by Elma’s motion to dismiss and the sole basis upon which the court’s determination was predicated pertains to the interrelationship between subsection 7(b-5) of the Parentage Act, section 5 of the same act, and section 12 of the Records Act.  Thus the factual issues which would determine whether Newsome’s suit was filed within the limitations period prescribed for a 7(b-5) action remain ripe for adjudication on remand. 

Accordingly, for the reasons stated above, the judgment of the trial court is reversed, and the cause is remanded in accordance herewith. 

Reversed and remanded.    

BURKE, P.J. and CAHILL, J., concur.

FOOTNOTES
1:
Under section 2-1401, a petition for relief from final orders and judgments "must be filed not later than 2 years after the entry of the order of judgment."  However, any period during which "the ground for relief is fraudulently concealed shall be excluded in computing the period of 2 years."  735 ILCS 5/2-1401(c) (West 2000).    

2:
Both the parties and the trial court refer to this complaint as a counter-complaint.  However, the statute itself provides that actions pursuant to subsection 7(b-5) “shall be brought by verified complaint.”  750 ILCS 45/7(b-5) (West 2000).  In keeping with the language of the statute, we refer to Newsome’s action as a complaint.  

3:
This view is supported by the legislative history of subsection 7(b-5).  During debate, the senate sponsor of the bill explained the situation which prompted the writing of the provision. The wife of a married constituent gave birth to a child while her husband was overseas in the Army.  When the husband returned, she sought and obtained a divorce, and the husband was ordered to pay child support.  Four years after the child was born, the husband learned through a DNA test that the child was not his.  However, under the law that existed at that time, he could not reopen the case.  He had to abide by the previous adjudication and continue to pay child support.  See 90
th
 Ill. Gen. Assem., Senate Proceedings 
49-50 (April 2, 1998) (statement of Senator Fawell).  In this situation, which is the circumstance that gave rise to the enactment of subsection 7(b-5), the adjudication of paternity was based on a presumption that since the couple were married, and since the child was born or conceived during the marriage, the husband therefore was the natural father.  See 750 ILCS 45/5(a)(1) (West 2000).  The adjudication thus was based on a 
presumption
, and not on scientific evidence.